BERNARD R. MITCHELL v. EMMETT M. EIDSON, Appellant.—50 S. W. (2d) 135.

Division One, May 27, 1932.

*Henry P. Lay* and *De Armond & Maxey* for appellant.

*R. B. Bridgeman* and *Silvers & Sheppard* for respondent.

GANTT, P. J.—Plaintiff seeks specific performance of contract in which defendant agreed to pay plaintiff $6000 and convey to him a farm of 120 acres with abstract showing marketable title, in exchange for a stock of merchandise. Specific performance was decreed with judgment for plaintiff for $2392.50. Defendant appealed.

Plaintiff alleged performance on his part. He further alleged that defendant and wife executed a deed conveying the land to him; that

defendant executed a note for $3800 as payment on the $6000; that the deed and note with other papers, were deposited in escrow with the Adrian Banking Company to be delivered to plaintiff on consummation of the contract; that defendant refused to pay the balance of $6000, and ordered the banking company to refuse delivery of the deed to plaintiff. Wherefore, he prayed for specific performance and judgment for $2200 with interest.

Defendant Eidson admitted that he was the owner of the farm and denied the other allegations of the petition. Further answering, he alleged that he was not experienced in merchandising and had no knowledge of the value of merchandise, which fact was known to plaintiff; that plaintiff falsely and fraudulently represented to him that the merchandise and fixtures were of the value of not less than $18,000; that he relied on said representations and was induced thereby to sign the contract; and that upon discovering the falsity of said representations he rescinded the contract. He further alleged that said land was his homestead; that his wife was not a party to said contract and that he was and is entitled to a homestead in said land, and that by reason of said representations and his reliance thereon and the sale of his personal property on the farm, he was damaged $5000. Wherefore, he prayed that specific performance be denied; that defendant bank be ordered to deliver to him the deed and $3800 note and prayed judgment for $5000 damages.

The Adrian Banking Company admitted that it held the deed, note and other papers in escrow until consummation of the contract, and further answering alleged that it was willing to deliver them under order of court.

The reply was a general denial. It also alleged that defendant did not rely on representations of plaintiff as to value; that he examined the merchandise and made inquiries of others, and from said examination and inquiries formed a judgment of the value of the merchandise before executing the contract and deed. It further alleged that defendant's wife aided him in an examination of the merchandise; that defendant, after advising with his wife, offered his farm and $6000 for the merchandise, which offer plaintiff accepted; that defendant's wife actively participated in the negotiations, and with full knowledge of the facts executed the deed, personally accepted the keys to the store, and with defendant entered into possession, took charge of the goods and aided defendant in conducting the business; that she thereby ratified the exchange of properties, and for that reason the deed is a valid conveyance of defendant's homestead.

On December 13, 1927, plaintiff, a farmer and without mercantile experience, traded a farm for a stock of goods at Adrian, belonging

to M. L. Tillman. On taking possession plaintiff had an inventory made which totalled $15,390. This did not include all the goods. He listed the stock for sale or trade with Blaine McCulloh, who in December, 1927, or January, 1928, called Sine Hooper at Ballard, a former merchant of that place and told him that "he had a deal for defendant and himself." Hooper called defendant at his farm a mile from Ballard and told him of the statement of McCulloh. In response they went to Adrian and McCulloh said: "I have got a $20,000 deal for you." Hooper answered: "That looks like too big a deal for me." McCulloh said: "With both of you together and taking this farm in, it isn't too big." They then went with McCulloh to the store and for an hour examined the stock of goods. The evidence for plaintiff tended to show that during the examination McCulloh stated in the presence of plaintiff that a part of the goods had been invoiced at one-third of the retail price, and the balance at one-half of the retail price, and that the total was $15,000. He also stated the names of the persons who made the inventory. The evidence for defendant tended to show that at said time McCulloh stated that a part of the goods so invoiced totalled between $18,000 and $19,000, and that if the fixtures and all of the goods had been invoiced, it would have totalled between $21,000 and $22,000. At the end of the examination, Hooper said the deal was "too big" and that he was not interested. He and defendant then left for home.

In a few days McCulloh and plaintiff went to defendant's farm and talked with him about trading the stock of goods for the farm. Plaintiff examined the farm and on leaving told McCulloh that he would trade the stock of goods for the farm and $7,500. Mrs. Eidson's father had been a merchant, and before marriage she clerked in the store. On the next day, January 3, 1928, defendant and wife went to Adrian and for several hours examined the stock of goods. Finally defendant offered his farm and $6000 for the goods, and plaintiff accepted the offer. In financing the transfer defendant agreed to assume payment of a $3800 note which plaintiff had given to Tillman when he traded for the goods, and also agreed to pay the $2200 balance after a sale of the personal property on his farm within sixty days. They then conferred with the cashier of the Adrian Banking Company about the Tillman note. The cashier suggested that Tillman might be willing to accept defendant's note in lieu of plaintiff's note. Tillman was called to the bank and was asked by defendant if he considered the stock of goods worth $18,000. Tillman answered "that it depends on how you are putting your farm in. It is if you put your farm in high enough." Tillman agreed to accept defendant's note in lieu of plaintiff's note for $3800 and the contract of exchange was written

and signed by plaintiff and defendant. Defendant and wife then executed a warranty deed conveying to plaintiff the land. Plaintiff deposited his check for $500 to cover the Bulk Sales Law, gave his check to defendant to cover an adjustment of the difference in the insurance on the properties and executed a bill of sale transferring the stock of goods to defendant. All of the papers, including the warranty deed were then placed in escrow with the Adrian Banking Company. Plaintiff then delivered the key to the store to defendant's wife, who took charge of the business. Defendant continued on the farm, except on Saturdays when he was about the store. He rented the store building from Tillman and proceeded to prepare the second story as a residence for the family. He opened a bank account, checked on same for running expenses and to purchase new goods, proceeded in the usual way to conduct the business, and paid $200 on the Tillman note from sales of merchandise. In advertising his property on the farm for sale, he stated that he had traded his farm for the stock of goods and would move to town. About this time defendant's wife told Mrs. Davidson of Ballard that they valued the farm at $100 per acre, when its market value was $50 per acre, and that they made a fine trade. Furthermore, while in charge of the store, she wrote to plaintiff stating that she had a buyer for the farm at $40 an acre, which plaintiff refused. Defendant's sale of personal property on the farm was on January 23, 1928. Plaintiff attended the sale. Defendant there notified plaintiff that he would not further comply with the contract; that if plaintiff would select a man, defendant would select a man and they could invoice the stock, and if it invoiced $15,000 he would comply with the contract. Plaintiff answered that he did not do business that way; that they had traded and that he (plaintiff) had complied with all the terms of the contract. Thereafter, and on February 1, 1928, the Adrian Banking Company was notified by defendant's wife to refuse delivery of the deed to plaintiff. Defendant continued in possession of the stock of goods and had it inventoried by three persons. After deducting one-third on part of the stock and one-half on the balance, the inventory totalled $11,500. These men testified that the stock of goods was of the cash value of $6000 or $7000. Defendant did not offer to return the stock of goods to plaintiff or to pay to him the proceeds of sales of goods. He had possession of the merchandise when a receiver was appointed to take charge of the store and farm pending this litigation. Evidence for defendant tended to show the market value of the farm was $9000. Evidence for the plaintiff tended to show the market value was $6000.

■ I. Defendant contends that delivery of the deed and other papers in escrow, in the absence of other evidence, authorized an inference that the delivery of the merchandise was subject to inspection by defendant as to value.

It was not so provided in the contract and the evidence showed that the delivery of the merchandise was not conditional. As stated, defendant rented the store building from Tillman, proceeded to prepare the second story for a residence, opened a bank account, checked on same for running expenses and to purchase new goods, proceeded in the usual way to conduct the business, paid $200 on the Tillman note from sales of merchandise, and sold the personal property on the farm. At that time in refusing to further comply with the contract, he did not claim a conditional delivery of the merchandise but proposed an invoice of the stock, and if it invoiced $15,000 he would complete the trade. The deed and other papers were delivered in escrow pending a compliance with the Bulk Sales Law, the payment of the $2200 and the furnishing of an abstract showing marketable title. ■ Moreover, if the merchandise was delivered to defendant subject to inspection as to value, it could not be contended that defendant relied on false and fraudulent representations when he executed the contract and deed.

II. Defendant next contends that plaintiff falsely and fraudulently represented the value of the merchandise, and for that reason specific performance should be denied.

■ Ordinarily, representations as to value do not constitute fraud. [McCaw v. O'Malley, 298 Mo. 401, 1. c. 413, 249 S. W. 41.] But assuming fraudulent representations, defendant did not believe them to be true. On the question he testified as follows:

"I did not think the goods were worth $15,000; most old stuff and quite a bit was not much good." On the quality of the goods, defendant's wife testified as follows:

"I went with my husband to look at the store and found some corsets and old gloves that I thought out of date and plenty of stuff that wasn't new. There was too much for me to tell it all. There wasn't much right up-to-date drygoods, and there was a lot of two-piece underwear and serges and things like that that people don't wear these days."

And by inquiring of Tillman, defendant indicated his doubt on the question of value. ■ Furthermore, plaintiff in no way limited the examination of the goods by defendant and his wife. They could have called others familiar with merchandise to aid them on the question of value. In other words, defendant had full opportunity to determine the question of value for himself. The question of false and fraudulent representations was well ruled by the chan-

452

cellor. [McCaw v. O'Malley, supra; Funding & Foundry Co. v. Heskett, 125 Mo. App. 516, l. c. 531, 102 S. W. 1050.]

III. Defendant next contends that specific performance should be denied because the farm was a homestead and the wife did not sign the contract.

The wife actively participated in the negotiations, was present at the signing of the contract, joined in the execution and delivery of the deed in escrow, took possession of the stock of goods and conducted the business, thereby ratifying the contract of exchange of the properties. Furthermore, the escrow of the deed removed the transaction from the operation of the homestead statute (Sec. 608, Revised Statutes 1929), which provides that the alienation of the homestead is void unless the wife joins with the husband in alienating such homestead. By joining in the deed conveying the homestead to plaintiff, the wife enabled defendant to make specific performance. [Fields v. Jacobi, 181 S. W. 65; Otto v. Young, 227 Mo. 193, l. c. 216, 127 S. W. 9; Seifert v. Lanz (N. D.), 150 N. W. 568; Mikelaiczak v. Kruppa, 98 N. E. (Ill.) 257; Johnson v. Kelley, 198 N. W. (Neb.) 567.]

The judgment should be affirmed. It is so ordered. All concur.